MECHANICS' BANK & TRUST CO. v. STALLO.    (No. 5691.)

(Supreme Court, Appellate Division, First Department.    April 24, 1914.)

1. BILLS AND NOTES (§ 527*)—ACTIONS—PAYMENT—EVIDENCE.

In an action on a note payable to a bank, evidence *held* insufficient to show that payments made to the president of the institution were made or accepted as payments on the note, but to show that they were made in pursuance of an agreement requiring the president to discharge the note.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 1847–1855; Dec. Dig. § 527.*]

2. BANKS AND BANKING (§ 117*)—POWERS OF OFFICERS.

As a corporate officer cannot bind the corporation to a contract in which he, himself, is interested, an agreement by the president of a bank that in consideration of certain payments he would substitute his note for a note of defendant held by the bank is not binding on the bank, where the transaction was for the president's own benefit.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 288; Dec. Dig. § 117.*]

Appeal from Judgment on Report of Referee.

Action by the Mechanics' Bank & Trust Company against Edmund K. Stallo. From a judgment for plaintiff, defendant appeals. Affirmed.

See, also, 160 App. Div. 934, 145 N. Y. Supp. 1133.

The opinion of the referee is as follows:

This action is brought upon eight promissory notes of the aggregate amount of $20,000, executed October· 31, 1907, jointly by the defendants Stratton and Stallo and one Alexander McDonald, in favor of the defendant Robinson, and indorsed by Robinson to the plaintiff. These notes were given in renewal of an original series of notes of the same amount which had been discounted for Robinson by the Mechanics' National Bank in Knoxville, Tenn., shortly after they were made. On August 23, 1907, the plaintiff, the Mechanics' Bank & Trust Company, was organized and acquired all the assets of the Mechanics' National Bank including these original notes. The notes now sued upon matured and were protested January 29, 1908.

[1] The defendant Robinson did not defend. Stratton and Stallo interposed answers pleading payment. Another action on these notes against the Metropolitan Trust Company, as administrator of the estate of Alexander McDonald, who died March 18, 1910, in which payment is pleaded, is pending. Both actions have been referred, and a stipulation has been entered into that the testimony taken in this action shall be deemed to be taken in both actions, with the opportunity extended to the attorneys for the Metropolitan Trust Company, as administrator, to cross-examine the witnesses of the plaintiff, to interpose objections, and to produce testimony on behalf of the Metropolitan Trust Company in the same manner as if upon the trial of the action pending against it. The testimony for the defendants has therefore been offered through the respective counsel for the defendants in both actions.

The contention of the Metropolitan Trust Company and of the defendants, except Robinson, is that the notes in suit were paid by the defendant Stallo to Robinson as an officer of the plaintiff bank and that Robinson had authority to and did receive payment of the notes, as the representative of the plaintiff. The fact is that no payment on the principal of the notes has ever been actually received by the plaintiff bank. The question to be decided, therefore, is whether the arrangement or settlement shown by the proof to have been made between Stallo and Robinson amounts to payment to the plaintiff.

The plaintiff contends at the outset that Robinson did not have authority

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to receive payment of the notes in any event. He was president of the plaintiff bank from the date of its organization in 1907 until January 13, 1910, when he was succeeded as president by E. G. Oates, who had been vice president of the bank since its organization. Robinson was simultaneously elected to the office of vice president, which he held until January 12, 1911. The alleged payment was made prior to that date. During all the time of his official connection with the bank he resided in New York City, where he was engaged in the practice of law and in various business and corporate enterprises. He drew a salary as president of the plaintiff only for the first few months of his incumbency of that office and thereafter was paid only his actual expenses in attending in Knoxville the quarterly meetings of the plaintiff's board of directors. There is evidence tending to show that he took no very active part in the management of the affairs of the bank. Under these circumstances, and in view of the fact that the transactions between him and Stallo, which are relied on as payment to the plaintiff, took place in the state of New York, and not in the domicile of the plaintiff, it is contended that the plaintiff would not in any event be bound by Robinson's unratified acts. I am not prepared to assent to that proposition, or to hold that Robinson acting as the president or vice president of the plaintiff and without any personal interest in the transaction could not have accepted payment of these notes in cash or its equivalent and thereby have bound the bank. However, I do not regard this consideration as controlling. To my mind, the nature of the transaction which it is claimed constituted payment and which the evidence quite clearly establishes is determinative of the case.

It appears that the relations between Stallo and Robinson during the period of the transactions under consideration were very close and friendly, and it is evident that Stallo placed the utmost confidence in Robinson and in his ability to perform his obligations. They had numerous and frequent business transactions as individuals prior to the making of the notes in suit and thereafter down to the middle or latter part of the year 1910. They had offices together during 1907, 1908, and the early part of 1909, and as late as January, 1910, there was a mutual running account between them covering office rent, traveling expenses and other items.

As has been stated, the notes fell due and were protested January 29, 1908. Stallo seems to have assumed the primary responsibility for the payment of the notes, though it does not fully appear what were the relations and mutual obligations between him and the other joint makers.

The bank through Oates, its vice president, made a number of demands on Stallo for the payment of the notes, from early 1908 to 1910. The last interview between them took place in October, 1910, that is some time after Stallo claims to have paid the notes. At the earlier conversations Stallo pleaded, as the reason for not paying the notes, that the moneys which were to be used for that purpose were tied up in another deal which he described. On or about February 26, 1909, at an interview in Stallo's office between him, Oates, and Robinson, negotiations were entered into looking to the renewal of these notes by the execution of a new note secured by certain collateral. There was then drawn a new note, dated February 26, 1909, payable to Robinson, and which was signed by Stallo and Alexander McDonald by Stallo as attorney in fact. The note recites as collateral for its security the eight notes now in suit, together with 100 shares of American Seating Company, $2,000 Tennessee Railway Company first mortgage bonds and 900 shares of Rapid Unloader & Equipment Company.

The plan outlined was that one M. T. De Vault, an associate of Robinson in certain enterprises, should hold this note until the collateral mentioned therein and certain additional collateral, other than the original notes, were assembled and placed in his hands, and that he should then deliver the note and collateral to the bank. The note was in fact held by De Vault, and certain of the collateral was delivered to him; but the requisite amount was never furnished, and the note was never delivered to the plaintiff. The certificate for 100 shares American Seating Company stock, which was delivered to De Vault, was returned to Stallo on January 17, 1910. That proposed transaction was never consummated; it was abandoned and the liability on the notes in suit continued unimpaired. Stallo paid the interest on these notes from their date

to December 17, 1909. For the interest to June 10, 1908, Stallo delivered his check to Robinson, and the latter duly mailed it to the bank. The interest which accrued thereafter and up to December 17, 1909, was on that date personally paid by Stallo to Oates. The amount of interest due on that date was in the presence of Stallo computed on the total amount of the notes, and was accordingly paid by him. This is one circumstance which establishes quite conclusively that Stallo fully understood that no payment on the principal of the notes had been made up to that time. And the proposed renewal note, which recited as a part of the collateral for its security the entire issue of the notes now sued upon and which Stallo executed on February 26, 1909, shows even more conclusively that Stallo knew on that date that none of the notes in suit had been paid.

On the subject of payment, there is a material conflict between the testimony first given by Stallo and the theory of payment which the defendants finally adopted. Stallo first testified that he paid to Robinson as the plaintiff's president, on account of these notes, the following amounts: $2,000 on May 26, 1908; $400 on April 3, 1909; $250 on May 5, 1909; $150 on June 4, 1909; $250 on June 30, 1909; $8,000 in checks of $2,000 and $6,000 on December 10, 1909; and $900.20 on January 20, 1910. He testified that in addition to these cash amounts, aggregating $11,950.20, he delivered to Robinson ten $1,000 bonds of the Tennessee Railway Company which Robinson agreed to take at a valuation of $9,000, thus making up the total amount required to satisfy the notes. The total was, in fact, more than sufficient by $950.20. It is to be observed that two of the outstanding notes were for the sum of $2,000 each, the exact amount which Stallo said he paid on account of the notes on May 26, 1908, and not only did he not demand the surrender of either note, but on February 26, 1909, signed the proposed renewal note for $20,000 and which recited as security the entire issue of notes in suit, and further on December 17, 1909, paid the interest to that date on the entire issue. This payment of interest was subsequent to all of the alleged cash payments except the $900.20, and yet Stallo paid interest on the full sum of $20,000 as if it had not been reduced by any payments. Stallo admitted that on the occasion of the payment of this interest he made no mention to Oates of any previous payments on the notes although, according to his testimony, he had already paid $11,050. As to the $8,000 paid on December 10, 1909, Robinson testified that this was an advance payment on a $15,000 note which he held against Stallo and McDonald. That note was not then due; but Robinson was hard pressed for funds at the time, and both he and Stallo agree that he was then requesting payments on this note.

Robinson testified that none of the alleged payments had any reference to the notes in suit, and in this he is corroborated by the circumstances heretofore mentioned. In any event, it is made clear, by the subsequent arrangement that Stallo knew that none of the moneys which he had given to Robinson were being applied upon the notes held by the plaintiff and he consented that Robinson should hold those moneys for his personal use. In this connection a memorandum of a proposed agreement between Robinson and Stallo, dated December 10, 1909, is very instructive. It recites the application of the $8,000 on the $15,000 note, a promised future payment of $2,000 on the same note, the agreement of Stallo to pay at an early date the interest on the $20,000 of notes held by the plaintiff and to renew said notes with collateral, and a balancing of their personal accounts by crediting on the $15,000 note any amount due Stallo. Robinson testified that this memorandum was mailed to Stallo but was not executed because they soon thereafter decided to make a different arrangement, the details of which appear in another memorandum bearing the handwriting of both Stallo and Robinson, and which clearly establishes that on January 21, 1910, Stallo and Robinson adjusted their mutual account and entered into an understanding concerning the notes held by the plaintiff. The itemized statement of account then prepared is the controlling feature of this case. It shows a balance due Stallo from Robinson of $2,099.80. On the paper is a computation showing the exact basis of the arrangement as to the notes in suit. There appears the cash item of $8,000 which Robinson had been paid on December 10, 1909, the ten Tennessee Railway bonds which were received by Robinson at an agreed valuation of $9,000, the balance due on ac-

count, amounting to $2,099.50, and the check of $900.20 which on this date was delivered to Robinson. The total is $20,000, and the odd amount of $900.20, which conflicted with Stallo's first attempt to show payment, is thus explained.

If this were the entire transaction, it might be argued with some force that at least some of these items were partial payments of the notes, though it is apparent that Robinson would have no authority to accept for the bank as payment on the notes his indebtedness to Stallo, or any cash amount previously received by him on another and independent obligation and which had become simply his personal liability to Stallo. His authority to accept for the bank payment in bonds, especially bonds of a railroad of which he was half owner, is very doubtful. When the transaction in its entirety is considered, it becomes obvious that the deal between Stallo and Robinson could not be fastened upon the bank. On the occasion of the statement of the account a six months' note for $20,000, payable to the plaintiff, was executed by the Harriman Securities Company, which was owned by Robinson and in fact was merely his corporate alias. The order of the indorsements on the notes was Robinson, Stallo, and McDonald, by Stallo as attorney in fact. The note recites as collateral security $20,000 of the bonds of the Tennessee Railway Company. The testimony of Robinson is that the agreement was that this note was to be given in place of the overdue notes in suit, that the security was to consist of $10,000 of Tennessee Railway bonds to be furnished by him and the $10,000 which Stallo had turned over to him, and that he was thus to assume and take care of the obligation to the plaintiff. It is to be noted that in the new note the liability of the parties was reversed, Robinson and his company assuming the primary responsibility, whereas in the then existing notes Stallo and McDonald were primarily liable.

Thus it becomes apparent that it was understood between Stallo and Robinson that as the latter had received the $20,000 his obligation on the new note should be prior to that of Stallo and McDonald. Under the arrangement made it is evident that there was no payment by Stallo on the notes in suit. The bonds delivered by him could not have been a payment on these notes, for they were to be used by Robinson as collateral for the new note; and the cash which Robinson had received and the indebtedness which he had canceled could not have been intended as a payment, for, if so, there could have been no necessity for a new note of $20,000. The conclusion is unavoidable that Stallo, in order to accommodate Robinson and adjust the account between them, made a personal settlement with Robinson whereby the primary liability on the debt to the plaintiff would be shifted to Robinson and the debt be secured in the manner stated. He evidently was willing that Robinson, who was in need of funds, should retain any moneys that had been paid and trusted him to meet the new note when due. While Stallo denies that this was the arrangement, he fails to give any satisfactory explanation of the new note for $20,000, in which the order of liability of the parties was reversed and which was executed simultaneously with the settlement of their accounts and the delivery of the check for $900.20. Stallo, in fact, refers in his testimony to this "deal" whereby Robinson "was to obtain a rediscount of the $20,000 notes."

The $20,000 note of the Harriman Securities Company and the $20,000 of bonds of the Tennessee Railway Company were subsequently delivered to the plaintiff bank. The bank returned the note and requested the execution of another on a special form of its own. The new note was executed; it was indorsed by Stallo individually and as attorney in fact for McDonald, who died prior to its delivery to the bank. The executive committee of the bank declined to accept it for the reason that the power of Stallo to sign for him was thereby terminated. Robinson was notified that the note had been rejected. The bank, however, continued to hold the bonds for some months, when they were returned to Robinson, who used them for his own private purposes. Robinson admits that he is liable either to Stallo or the bank for $20,000. There can be no doubt that he was guilty of a serious breach of duty in appropriating the $10,000 of bonds which Stallo had delivered to him for use as collateral to the Harriman Securities Company note; and for that misappropriation he is accountable to Stallo. It is clear to my mind that, if the note of the Harriman Securities Company had been accepted by the bank

with the $20,000 of bonds as security, the precise arrangement which Stallo and Robinson contemplated would have been accomplished, and that, if Stallo or McDonald had afterwards been compelled as indorsers to pay the note in whole or in part, they would have had no grievance or claim except a personal one against the Harriman Securities Company and Robinson as being primarily liable.

This view of the transaction is also strongly supported by the testimony of Oates, of Oliver, and of Judge Wright, the local counsel for the bank, detailing an interview with Stallo in his rooms at the Waldorf-Astoria Hotel, in October, 1910, on an occasion when Oates broached the subject of these notes and insisted on payment. These gentlemen agree that, while Stallo first claimed that he had given the amount of the notes to Robinson, he admitted that he knew they had not actually been paid, and that he was still liable on them. Stallo, of course, was then aware that the Harriman Securities Company note had been rejected by the bank. The claim of payment made by Stallo, and his simultaneous admission of liability, are most natural in view of the nature of his arrangement with Robinson. Stallo's account of the conversation differs materially from that of these witnesses, but I am inclined to believe that his memory is at fault, and that the version of the other witnesses is correct. It also appears that on July 7, 1910, Oates mailed a letter to Stallo, demanding payment of these notes, but received no reply, and that on August 20, 1910, he wrote again inclosing proof of claim on the notes against the estate of McDonald, of which Stallo was then the administrator, and this was acknowledged only by Stallo's secretary, to the effect that it would receive attention in due time. Then followed the interview at the Waldorf between Oates, Oliver, Wright, and Stallo.

[2] The ultimate contention of the defendants is that the arrangement made between Stallo and Robinson, for the discount of the Harriman Securities Company note, was made on behalf of the bank, and was binding upon it. It should be observed here that no officer of the bank, except Robinson, who was then vice president, had any knowledge of the complete arrangement which Stallo had made with Robinson. The testimony of Oates and Robinson, that such knowledge was not communicated, is corroborated by the letter of Robinson to Oates of February 21, 1910, wherein Robinson outlines the arrangement only partially, and states that the Harriman Securities Company had purchased from Stallo a part of the bonds to be deposited as collateral. In the absence of any ratification of this arrangement by the bank, the contention that the bank is bound on the theory that Robinson had made it on behalf of the bank is answered conclusively by the legal limitations on Robinson's authority in such a transaction. He had a direct personal interest in effecting this arrangement. He thereby proposed to assume the primary liability on this obligation, in consideration of the settlement of his debt to Stallo on account, the payment of $900.20 in cash, the retention and use for his personal purposes of $8,000, which he had previously received, and the surrender of the $10,000 of bonds to be used as part of the collateral. His interest in the transaction is apparent. Whatever may have been his powers, if there had been an absence of any personal interest in the arrangement, he had no power to bind the bank under the circumstances disclosed.

In the article, Banks and Banking, 5 Cyc. p. 466, the author states the rule as follows: "An officer cannot act in a transaction in which he is personally interested for both parties, and, should he do so, his acts would not bind the bank and would become valid only through implied or expressed ratification. The sale of a note by a president or a cashier to a bank of which he is the manager can never be valid without some act of the directory."

This proposition was cited with approval in First National Bank v. Gunhus, 133 Iowa, 409, 110 N. W. 611, 9 L. R. A. (N. S.) 471, and is a well-recognized doctrine.

The rule is based upon a fundamental principle of the law of agency. In Voltz v. Blackmar, 64 N. Y. 440, 446, the court said: "It is a rule which stands upon the solid basis of reason and common sense that an agent, in matters touching the agency, cannot act so as to bind his principal when he has an adverse interest in himself. The law will not permit a conflict in this way between his interest and his duty, and removes the temptation to wrong,

by absolutely disabling him in such a case from acting for himself, and at the same time for his principal."

In Innerarity v. Merchants' National Bank, 139 Mass. 332, 1 N. E. 282, 52 Am. Rep. 710, the court held that a director of a corporation, acting avowedly for himself or on behalf of another with whom he is interested in any transaction, cannot be treated as an agent.

The rule that an officer of a bank is powerless to bind it in any transaction in which he has a personal interest is also supported by Bank v. Purdy, 100 App. Div. 64, 91 N. Y. Supp. 310.

In Fowler v. Walch, 119 App. Div. 542, 104 N. Y. Supp. 54, the court held: "The president of a bank who procures a note made by himself and others to be discounted by the bank solely for the joint benefit of himself and the other makers cannot by acting or assuming to act for the bank make any agreement respecting the note which will in any way relieve the makers, himself included, from their obligation, if such agreement by the president has not been ratified by the bank otherwise than by his own acts."

This principle is clearly applicable to the attempted substitution of one note for another, as contemplated in the arrangement between Robinson and Stallo. It may have been a fact that the new note of the Harriman Securities Company was as well secured as the original notes, but Robinson, interested as he was in having the new note accepted by the bank, was not in a position to pass on that question, and Stallo is certainly chargeable with notice of his want of authority.

It is my opinion that the notes in suit have not been paid in whole or in part, and that the plaintiff is entitled to judgment in the sum of $20,000, with interest from December 17, 1909.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

N. Rockwood, of New York City, for appellant.
C. H. Payne, of New York City, for respondent.

PER CURIAM.   Judgment and order affirmed, with costs, on the opinion of Leventritt, referee.   Order filed.

---

(162 App. Div. 248)
MERCHANTS' NAT. BANK OF ST. PAUL v. SANTA MARIA SUGAR CO.
(No. 5700.)

(Supreme Court, Appellate Division, First Department.   May 8, 1914.)

1. BILLS AND NOTES (§ 150*)—NEGOTIABLE INSTRUMENTS—"NEGOTIABLE NOTE."

A written instrument by which the maker promised to pay to the order of the payee on a specified date in the city of New York $2,340 for the second installment agreed on of the price of a crane of the payee's manufacture, purchased on the date of the instrument according to the specifications of the payee's representative, dated and signed, was a "negotiable note," as defined by Negotiable Instruments Law (Consol. Laws, c. 38) §§ 20, 22.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 55, 374–379, 405, 406; Dec. Dig. § 150.*

For other definitions, see Words and Phrases, vol. 5, pp. 4770, 4771.]

2. BILLS AND NOTES (§ 356*) — INDORSEMENT — PURCHASER FOR VALUE — DISCOUNT BY BANK.

Plaintiff bank discounted a note sued on for a customer before maturity, crediting the proceeds of the discount to the customer's account, which account at all times prior to the dishonor of the note contained a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes