THE MERCHANTS NATIONAL BANK OF PLATTSBURGH, NEW YORK, Plaintiff, *v.* R. PRESCOTT & SON, INC., Defendant.

Supreme Court, Clinton County, March 21, 1931.

*Feinberg & Jerry*, for the plaintiff.

*Thomas F. Conway* [*Thomas C. O'Brien, William F. Pritchard*, and *Pierce & Holcombe* of counsel], for the defendant.

ROGERS, J. The decisions of the appellate courts in this action (225 App. Div. 612; affd., 253 N. Y. 517) left for trial only two questions: Did Levy agree to be obligated on the notes as maker, rather than as indorser, as indicated on the notes, and, if so, did the plaintiff have knowledge thereof?

In December, 1924, officers of the Thermiodyne Radio Corporation, including John Guibord and Levy, had a conversation with officers of the defendant looking toward the formation of a new corporation for the purpose of taking over the defendant's physical properties and manufacturing radio cabinets for the Thermiodyne Radio Corporation. In the January and February following some of the conferees had further talks. Finally the negotiations took definite shape in a written agreement, dated February 16, 1925, and executed February 24, 1925, made between Rufus A. Prescott and Roger B. Prescott (called the Prescotts), R. Prescott & Son, Inc. (the defendant), and John W. Guibord (acting for himself and others called the bankers). Speaking generally, the agreement provides that the defendant shall divorce

itself of certain of its activities and dispose of certain of its properties and equip itself to manufacture radio cabinets; that a new corporation shall be organized by the Prescotts which shall acquire the plant and property of the defendant; that Guibord and his associates shall have an option to purchase 72,500 shares of the capital stock of the new corporation for the sum of $260,000. The agreement also contains this provision: " In consideration of the foregoing premises the parties hereto have agreed as follows: *First*. The bankers will lend the present company One hundred sixty thousand dollars ($160,000.00), which shall be represented by its interest bearing notes, payable three months after date and which may be renewed by it at three months intervals, so that the last renewal shall mature not later than nine (9) months from the date of the original loan."

Although this provision of the contract, according to the testimony of the Prescotts, is not in accord with some of the preliminary negotiations regarding the advancement of capital by the bankers, nevertheless the parol evidence rule requires that it must be treated, until duly modified, as the arrangement agreed upon by the parties. (*Thomas* v. *Scutt*, 127 N. Y. 133; *Mitchill* v. *Lath*, 247 id. 377.)

The contract appears to be complete. It sets forth a full plan to accomplish the result desired. It was carefully prepared, after conferences and preliminary drafts, by an able, conscientious attorney who, although retained by defendant at Guibord's suggestion, was loyal to the interests of his client. The contract was read over by defendant's officers before execution. The proof does not meet the requirements necessary so that it may be varied by an oral collateral agreement. (*Mitchill* v. *Lath*, 247 N. Y. 377, 381.)

There is insufficient showing of fraud either in the factum or in the treaty. The parties intended to make the contract that was made. There was a meeting of their minds. With intelligent comprehension they assented to its terms.

It is claimed that Guibord made certain misstatements during the negotiations regarding the financial condition of the Thermiodyne Company. This company was not a party to the contract. There is no provision in the contract that the Thermiodyne Company would give the defendant continuous cabinet business, nor did Guibord so agree in the contract. If the defendant wanted assurance in this respect it should have made an appropriate agreement to that end, either with the Thermiodyne Company, or with Guibord. At the time, apparently all parties concerned believed the Thermiodyne Company to be a growing and flourishing concern and that it would furnish a large amount of cabinet business,

which naturally the officers thereof would be inclined to give to the defendant.

The Prescotts testified that Guibord told them during the earlier negotiations that Williams was one of his associates. Williams testified that he had never seen the agreement prior to the trial, but had heard that there was some sort of an option agreement. This is rather an equivocal statement and is hardly sufficient to show the falsity of Guibord's statement when made that Williams was one of his associates. But, when the notes were given, Guibord made a further statement in explanation of the reason why Williams was unable to indorse, and probably, taking both statements together, the jury might find there was a misstatement by Guibord as to Williams being an associate.

Of course, the contracting parties must be described in the contract and it must be executed by the parties or their agents, otherwise it is a nullity. (*Rodliff* v. *Dallinger*, 141 Mass. 1, 6.) But this principle is inapplicable here because Guibord was named a party in the instrument, as acting for himself and others, and Guibord signed the instrument. This is not a case where one of the parties, whom it was agreed should be named in the contract and sign the same, failed to do so. Nor is it a case where one of the parties signed believing the paper to be other than it was in fact, as in *Whipple* v. *Brown* (225 N. Y. 237). The parties intended to make a contract and succeeded in so doing. All the negotiations immediately preceding the preparation and execution of the contract were with Guibord. His associates did not take part in them. The Prescotts dealt with Guibord alone. They looked to him to perform his part of the agreement, associating with himself whomever he pleased, as so-called " bankers." Therefore, the writing, in so far as who the parties were is concerned, expressed a meeting of the minds between the signers. The Prescotts did not know Williams, did not rely upon his financial ability or reputation, but they did know Guibord well and favorably. On March tenth, when the notes were given, the Prescotts were satisfied to indorse in Williams' stead on Guibord's statement that he would protect them. The defendant could not hold any one liable on the contract, as one of the " bankers," simply because Guibord named him as such, without other proof of Guibord's authority or ratification. (Mechem Agency [2d ed.], §§ 285, 291.) Defendant had the right to expect that the contract bound Guibord and such associates, who accepted its provisions or authorized Guibord to act for them in signing. Potter, Levy and Eckhardt ratified it by indorsing notes. When Williams did not join the others, the Prescotts indorsed in his place and thus affirmed the

contract, after learning that Williams was unable to help raise the money for working capital.

If the defendant did not intend to agree that Guibord could nominate his associates, it was negligent in not having them named specifically in the writing. It cannot be heard now to say that the writing is not a contract, because some one is not a party who Guibord said was one of his associates. The rights of Levy and his assigns, under the contract, cannot thus be wiped away. After Levy indorsed the defendant's notes, presumably relying on the contract, his rights under the contract and those of his assigns became fixed.

The implication that the defendant's loan, evidenced by its notes, was to be paid by the defendant is within the protection of the parol evidence rule and cannot be contradicted by oral testimony of a previous understanding. (*Reed* v. *Bank of Attica*, 124 N. Y. 671; *Morowsky* v. *Rohrig*, 4 Misc. 167.)

The parol evidence rule is applicable not only between the parties, but also to those claiming rights originating in the relationship established by the written instrument. (*Spingarn* v. *Rosenfeld*, 4 Misc. 523; Wigmore Ev. § 2446; Williston Cont. § 647; Richardson Ev. § 452.) Defendant repeatedly recognized, in its correspondence, the force and validity of the written contract.

On March 10, 1925, the Prescotts met John W. Guibord in the president's office of the plaintiff. At that time five $10,000 notes made by the defendant payable to its own order and indorsed by it, were delivered to Guibord for the purpose of having them indorsed by Guibord and his associates and discounted at the plaintiff bank. It is claimed by the Prescotts that at that time Guibord stated to them that he and the several individual indorsers would in reality be primarily liable on the notes and that the corporation would be liable as maker only in form. The Prescotts testified that they issued the notes relying on this modification of the written agreement.

Two $10,000 notes made and indorsed by the defendant and also indorsed by Levy (which were renewal notes of the series of March 10, 1925) were paid (on November 10, 1925) by Levy, and thereupon he delivered to the plaintiff two $10,000 notes of the defendant (renewals of the notes paid by him) as collateral security for his indebtedness with the bank. These two notes were once more renewed by the defendant and then payment refused, on the grounds set forth in the fourth partial defense.

In the above quoted portion of the written agreement, the bankers did not agree to become primarily liable for the defendant's notes. They agreed to *lend* defendant $160,000, " which shall be

represented by its interest bearing notes." Thus, the writing and the statement claimed to have been made by Guibord on March tenth are wholly inconsistent.

The parol evidence rule is not "infringed by the admission of oral evidence to prove a new and distinct agreement, upon a new consideration, whether it be as a substitute for the old, or in addition to and beyond it." (1 Greenl. Ev. [16th ed.] § 303.) The only requirement for the validity of a parol modification of a written contract is consideration. (*McIntosh* v. *Miner*, 37 App. Div. 483.) Even a subsequent parol modification of a sealed contract, which has been executed by one of the parties, is valid and enforcible. (*Harris* v. *Shorall*, 230 N. Y. 343.)

The claimed modification of the writing is not binding (even upon Guibord) for no new consideration supports it. The defendant was bound under the written agreement to do exactly as it did do, namely, to give the bankers its interest-bearing notes. It did no more than this. Moreover, if Levy was one of the bankers (and it may be inferred from his acts that he was), it does not appear that Guibord had any authority from Levy to modify the written agreement as to the defendant's primary obligation on the notes. When Levy indorsed the notes and the renewal notes and finally discharged his obligation as indorser by payment, there is nothing in defendant's proof to show that he was not acting and relying upon the written agreement.

The defendant indicated that it was treating the notes as its primary obligation, by its instructions to its attorney, who prepared the draft and final forms of the contract, and by carrying the notes on its books and balance sheets as its obligation. Interest on them was repeatedly paid by the defendant. Financial statements made by defendant treated them as its obligation, and in its correspondence the defendant frequently referred to them "as our notes." It never questioned its liability thereon until November, 1925, when the Thermiodyne Corporation canceled its order for cabinets.

There being no proof of any promise on Levy's part, or by any one authorized to act for him, to modify the written agreement, and there being no consideration for such promise, even if it were made, the written agreement fixes the liability of the parties on the notes. It cannot be held that a new agreement took the place of the written arrangement.

The Prescotts (evidently referring to primary liability and not that of indorser) testified that Levy, at a conference held in New York city attended by the Prescotts, their counsel, Guibord and Levy, "admitted liability but inability to pay at that time." This is a conclusion perhaps formed because, according to the Prescotts'

testimony, Levy did not deny his liability. Levy's admission of liability might be some evidence of ratification by him of Guibord's authority to modify the written contract, but since the agreement to modify is without consideration the admission in this respect is not helpful. Although legal liability did not exist, Levy may have thought it did, like one sued for libel might mistakenly admit his liability because he uttered the alleged libelous statement, which in law did not amount to libel. If the proof showed any legal liability, then Levy's admission of liability would be added evidence of liability, but the admission without such other proof and with conclusive proof to the contrary, does not raise an issue. (*Matter of Toukatley,* 122 Misc. 120; *Moore* v. *Hitchcock,* 4 Wend. 292; *Insurance Co.* v. *Telfair,* 45 App. Div. 564.)

Moreover, Levy's death rendered the Prescotts incompetent witnesses to give this testimony. (Civ. Prac. Act, § 347.) The Prescotts, as the principal stockholders of the defendant, were interested witnesses and the bank derived or *claimed* its title to the notes from Levy. When this appeared in the proof, plaintiff's motion to strike out this testimony should have been granted. (*Andrews* v. *Reiners,* 112 App. Div. 378; *Griswold* v. *Hart,* 205 N. Y. 384; *Brown* v. *Crossman,* 206 id. 471; *Matter of Kelly,* 238 id. 71; *Matter of Callister,* 153 id. 294, 307.)

The fact that Levy was a partner in the enterprise does not change the rule. (*Herschman* v. *Fischer,* 206 App. Div. 629; *Ellis* v. *Ellis,* 196 id. 896; *Adams* v. *Morrison,* 113 N. Y. 152.)

The door was not opened by the testimony of plaintiff's cashier of a personal transaction with Levy, for section 347 of the Civil Practice Act expressly provides that a bank officer of a party to the action shall not be deemed interested. Moreover, the open-door rule must be applied strictly to the same transaction or communication. (*Martin* v. *Hillen,* 142 N. Y. 140; *Matter of Callister,* 153 id. 294.)

Again the bank's rights could not be affected by Levy's admission. " The general rule in this State is that the former owner of a chattel or chose in action who has transferred his interest to another, cannot by subsequent admissions affect the right of the owner or holder." (*Wagner* v. *Grimm,* 169 N. Y. 421, 431, 432.)

The foregoing makes it immaterial whether or not the bank had knowledge, when it took the notes from Levy as collateral, of the alleged modification of the written agreement, and that Guibord had promised the Prescotts that he and the indorsers would be primarily liable. Suffice it to say that the defendant furnished no direct evidence on the issue and insufficient proof by inference to justify a finding that the bank had such knowledge or even

knowledge sufficient to put it on inquiry. The failure to reply to defendant's counsel's letter of December 21, 1925, written more than a month after plaintiff had taken the notes as collateral, cannot be deemed an admission that its contents were true. Defendant cites cases from foreign jurisdictions for this proposition. No New York authority is given. After a matter reaches the hands of the lawyer for one of the parties, good sense dictates to the other party not to indulge in voluminous correspondence and futile denials.

The plaintiff did not place the notes with the Central Union Trust Company until after the defendant notified plaintiff it was not liable on them. Plaintiff's evident purpose was to make the New York bank its agent to collect them, hoping the defendant might pay such bank without suit. Such practice does not give rise to an inference of knowledge of an infirmity at the time it took the paper. Without such knowledge, the bank could rely upon the apparent obligation of the defendant as maker and may also have the benefit of the relationship of the parties, as stated in the written contract. Whatever John Guibord knew of such agreement was not the bank's knowledge because of Guibord's personal interest in the transaction. It might be to Guibord's but it was not to the bank's advantage to accept notes that were in legal effect other than they appeared to be. Knowledge by the bank that the defendant was not to be primarily liable on the notes would affect their negotiability and lessen their value. Under such circumstances, John Guibord's knowledge is not the bank's knowledge, although he was vice-president of the bank and took part in the sale of the notes to the bank. It will not be presumed that he passed on to the disinterested officials of the bank information which might have prevented the bank from taking the notes. (*Brooklyn Distilling Co.* v. *Standard D. & D. Co.*, 193 N. Y. 551, 555; *Manhattan Co.* v. *42nd St. R. R.*, 139 id. 146, 151; *Bank of LeRoy* v. *Purdy*, 100 App. Div. 64; *Fowler* v. *Walch*, 119 id. 542; *First Nat. Bank of Whitehall* v. *Tisdale*, 18 Hun, 151; affd., 84 N. Y. 655; *Mechanics Bank & Trust Co.* v. *Stratton*, 162 App. Div. 704; affd., 220 N. Y. 747; *American Nat. Bank* v. *Ritz*, 70 W. Va. 409; 74 S. E. 679; 40 L. R. A. [N. S.] 156.)

There is testimony that the cashier of the bank said, " He knew about the different ones endorsing." When he made this statement, he had seen the original and renewal notes which were indorsed by " the different ones " and naturally knew who the indorsers were. The cashier's knowledge regarding indorsers is not sufficient to impute to the bank knowledge that the indorsers had agreed with the maker to pay the notes.

The fourth partial defense alleges that Eckhardt, having primary liability to pay the $10,000 note indorsed by him, did in fact pay it to the plaintiff. If this allegation is true, and the defendant delivered to the plaintiff a renewal note for the note paid by Eckhardt, without knowledge that it had been paid, and since $30,000 of the $50,000 of the defendant's notes held by the plaintiff have been paid, the plaintiff would have a credit of $10,000 available to take care of one of the $10,000 notes deposited with the plaintiff by Levy as collateral. Defendant's proof, however, does not establish that the so-called "Eckhardt" note was paid. It goes no further than to raise a suspicion, which perhaps confused the jury. The "Eckhardt" note was made payable at the plaintiff bank. On July 10, 1925, the bank received it for payment through the Plattsburgh National Bank and Trust Company. Through exchanges with the latter bank, the plaintiff paid the note. Thereupon the bank accepted from the defendant five $10,000 notes in renewal of the four notes owned by it and the "Eckhardt" note which had been paid by it. Eckhardt did not have an account with the plaintiff bank and did not deposit with the bank any funds to meet the note indorsed by him. The defendant received a credit with plaintiff of $10,000 on July 10, 1925, the day the Eckhardt note was charged to them. Evidently, the credit arose from the discount of the extra $10,000 note delivered at that time by the defendant to the bank.

The two individual $10,000 notes of Levy, due October 9, 1925, were renewed by new notes for the same amount due December 8, 1925. They were in no way related to the notes in suit. They were not given, as suggested by defendant, to pay two of the defendant's $10,000 notes indorsed by Levy and sold to the Manufacturers National Bank of Troy. The similarity of the amounts created some confusion at the time the evidence was adduced, but when analyzed it is perfectly clear that Levy paid none of the defendant's notes until November 8, 1925, when he deposited the renewals with the bank as collateral for his own indebtedness.

Levy's liability being merely that of indorser, and if it were otherwise the bank having no knowledge thereof, and it appearing that neither the defendant, nor any one in his behalf, has paid the notes deposited by Levy as collateral, the bank is entitled to collect them. Therefore, the verdict is contrary to and against the weight of the evidence, and contrary to the law and must be set aside, and inasmuch as the defendant's proof makes no question of fact for the jury the plaintiff is entitled to a direction of a verdict in its favor amounting to the principal of the notes, $20,000, and interest to the date of trial, in all the sum of $25,470.